A medical surgery on December 8th of 2004. It's technically called right distal femoral osteotomy. Relevant to the court's decision-making process today, but the to say that it didn't go well. She was worse off for years after the procedure and still is much worse off. It was intended to relieve some pain and enable her to maintain an active lifestyle. And the record evidence showed that it didn't work out that way. The initial procedure that took place, the hardware that was supposed to be installed, failed, which was not a breach of the standard of care. That sometimes can happen. But the breaches of the standard of care happened when the backup plan was put in motion. And that wasn't successful. Her leg never healed and she had to have a but has left her with more pain than she had before, less mobility, and an inability to resume her lifestyle. How do we go from 2004 to 2019? Your Honor, that is a good question. And I will do my best to speak to that. I became involved with this case about three months before it was set to go to trial in a way. The more recent lawyer that was working on the case basically had a conflict and withdrew and my client wished to get new counsel. This was on the eve of trial in September of 2016. I was a friend of the to get a new lawyer. The judge gave about three months extension of the trial date. And in that time, we were unable to find other counsel. And so I stepped in and handled the case. But having said that, my understanding is that this was filed once within the statute limitations and then voluntarily dismissed and then refiled a few years before. It still went on for a while, but that is... So when you went to trial, you inherited everything, including the testimony of plaintiff's expert, which was secured by way of evidence deposition, right? That's correct. That's correct, Your Honor. And that's really one of the four issues that we're dealing with here. And it's not that there was a problem with the evidence deposition of the plaintiff's expert from our perspective. He was likely going to testify very similar to that from... One would hope. One would hope. And if had he not, I'm sure the defendants would have objected and the court would have gotten involved. So what happened is that we expressed the desire to call him live at trial. We indicated we're in conversations about calling him live at trial. What was it about the testimony that had already been secured by way of evidence deposition that made you think that maybe you'd be better off calling him live? There wasn't anything about the substance of the testimony. It was just simply that the defendants were calling their primary experts live at home from the University of Chicago. And we simply believed that juries are going to pay... I believed that juries were going to pay better attention to an expert standing before them. How is it that you were going to get past just this one aspect of Dr. Vance's testimony on the informed consent issue, where Dr. Vance testified that deposition that was shown to the jury, that he had no reason to believe that Dr. Stevens had not adequately warned the plaintiff about the risks of this procedure? How are you going to get past that? Well, so that testimony, I believe, would have been the same either way. And that really takes us to another of the four issues, and that is the court granted a directed verdict on the informed consent count. There was a surgical malpractice count and an informed consent count. I think that's the graveling of what we're trying to look at today. Yeah, and he took that away from the jury. And he did it based on two mistakes, we believe. Number one, the defendants argued that we had to prove every element of an informed consent claim via expert testimony. And that is just incorrect as a matter of law. And you needn't look no further than that. And that, and the fact that you have a surgical malpractice claim is the duty point of it. But your expert, the one you inherited, said that he had no reason to believe that informed consent had not been satisfied. How do you get past that? You're proving their case for him. No, I think if you read his particular testimony, what he was asked is, you know, do you have any reason to believe that Dr. Stevens didn't, in fact, you know, use words about informed consent? And he said, I wasn't there. That was part of his answer was, I wasn't there. He didn't purport to opine that it was appropriate or not appropriate. He said, I can't speak to what was said between Dr. Stevens and the plaintiff, you know, ten years ago. I wasn't there. Well, there are depositions that experts can rely upon. There are medical records that a doctor can rely upon. There's his knowledge of the procedure. All of that can be used to form an opinion that the patient was not properly warned about the risks of the procedure. That's the way these cases are tried. The expert comes in and says that informed consent was not satisfied in my opinion because of A, B, and C. And the plaintiff says, boy, if I had known that, I never would have undergone the procedure. And then you get to the jury. If you don't have the expert, the object of testimony, you ain't going anywhere. Well, certainly, Your Honor, if you have a clear record, say where the informed consent is laid out in a letter, right, and the expert looks at that letter and is asked, is that, if that was the informed consent, is that sufficient? Then you would expect them to say, that's not sufficient, in order for a plaintiff to survive a motion like this. The problem here is there was no documented record of the informed consent. There was some letters, but they didn't mention the risk of a nonunion, which is the failure to heal. They didn't mention the key risks that she indicated, you know, she might never be able to walk again without a limp. But she even testified that she couldn't remember what she said. She testified that she couldn't remember everything that she was told. But she did say that he warned her about three things, you know, a motion and a failure to heal. But he didn't testify that there was the possibility of the loss of a medial hinge. And there's no evidence from him either that he told her that. Well, there is a letter from Dr. Theodoropoulos that said damaged nerves, damaged arteries, damaged vessels, damaged tendons, bleedings, infections, other medical problems, including death, or the condition may not improve and may in fact get worse. So that's in writing. That's in the record. That is correct, Your Honor. And that letter went to her primary care doctor, and there's no indication that that was ever provided to her. And it doesn't mention the risk of the loss of a medial hinge, which is this procedure she was doing. There was a risk that if, when they adjusted the leg, they basically cut a pie-shaped wedge in the bone, and when they adjust it, that there's a risk that the part that's still hanging on won't hold. And she was never told that. But your expert testified he had no reason to believe that Stevens had not disclosed the material risks. How are you getting past that? Because what he says is, if you also look at what he said, is he says, I wasn't there. And so as a legal matter, the legal question is Look, look, look. I tried these cases for almost 30 years, okay? The experts are never there, okay? That doesn't get you anywhere. Well, if you look at the Coryell case, which is the seminal case in the state, it came out of the first district, and the key quote from that is on page 550, and it simply says, In an informed consent action, after they have been educated as to the information that the physician should have disclosed to the plaintiff, which is element one of a claim, no one is in a better position than the jury to determine whether any alleged undisclosed information would have altered the plaintiff's decision. And then we also cite to, you know, a California case that deals with this subject in more detail, Cobbs v. Grant. But the defendants came in and said, every element of an informed, initially, every element of an informed consent claim has to be proved by expert testimony. Well, that's simply not true. I mean, one of them is injury. One of them is causation. And it's simply not the case. Our view is that, and I think the law supports, particularly Coryell, that only element one needs to be proven, and that is, what's the duty? What is it they have a duty to disclose? And both Dr. Vance, as well as Dr. Ho, defendants' experts said that they believe there was a duty to disclose the risk that this medial hinge would be lost, as well as the risk of a nonunion. And Dr. Stevens was never able to say that he disclosed that to her, and it's nowhere disclosed in writing. And it really brings us to the other point about informed consent, and that is, is it a subjective standard, or is it an objective standard? And the trial – What's the problem with the subjective standard in the context of an informed consent case? Well, I mean, the problem is that it's not the law. The law says it is an objective. It's a reasonable or a reasonable – No, the problem with the subjective standard is that, of course, every plaintiff is going to testify that I never would have undergone the procedure had I been told A, B, or C. I mean, that's why the law requires objective. That – I think that's correct, Your Honor. It's also why that in cases where the plaintiff says, oh, yeah, I never would have done this had I known, the courts have cautioned – appellate courts have cautioned courts to view that with skepticism. It's the jury's job to decide, regardless of what the plaintiff said or didn't say. The jury needs proof. Okay? The jury needs proof. The plaintiff can testify that she wouldn't have undergone the procedure, but you also have to have somebody else present objective evidence, whether it's in the form of testimony, that a reasonably informed patient would not undergo the procedure because they didn't warn her about A, B, or C. And I think when you look into the record and look at the whole testimony – We did. About what was provided, you know, she testifies that she was having trouble running. She'd been active her whole life, run a lot. She was preparing for a half marathon or some other sort of race and started having pain. That she was 40 years old. This was supposedly a childhood injury. And she went to a doctor and they said, you can do this surgery and you should be able to resume an active lifestyle without pain after an appropriate time for healing. And she talks about what her lifestyle was. And there's plenty of evidence about the failed surgery, the fact that it didn't heal. It went on for six months before they finally had a subsequent procedure to fix it. She still walks with a limp. She still has pain. She had a bad result. There's no question about it. There's no question about it. And I think that if you look at that evidence as a whole, you could conclude that a reasonable person in her situation would never have agreed to undergo that. That's entirely speculative unless you have evidence presented to the jury in the form of an expert witness who has an opinion that the right stuff wasn't disclosed, testimony by the plaintiff, or something in the medical records that proves that that information was not given. And it's after the fact. So you're trying to back that up. So I suggest you move on to the other issues. Yeah. And the only thing I would say, Your Honor, I will. The only thing I would say about that view, I believe it's inconsistent with Coriell. And, you know, one of the cases, the defendant's side, the Ziniotis case, I might be pronouncing that incorrectly, they believe effectively overruled Coriell. You know, the Supreme Court has made clear, if you're going to overrule something, you should make it clear. And nobody has ever indicated that the law in Coriell has changed. There's three other cases they cite, too, which all agree. What's that, Your Honor? There's three other cases cited, Smith, Magnum, and something I can't pronounce. And he's going to agree with the Smith case. He's a pretty smallist. Very true, Your Honor. That's why they put it in there. There's 11 cases out there. Yeah. So if you look at, we cite a number of cases, the Krim case as well as the Coriell case, that make this point. And we believe it's clear that you don't have to prove, via expert testimony, all elements. You know, the second point that we believe led to an unfair and prejudicial result at trial has to do with 212B and has to do with this expert issue. And we talked about it a moment ago, just briefly, but let me just touch on a couple of points about that argument. And that is that, you know, you've got to look at the language to the rule. First of all, I think it's a de novo standard the Supreme Court has said. You look at interpretations of Supreme Court rules is a de novo standard. So we believe that's the correct standard to apply here. And if you look at the language of that rule, it says you can take an evidence deposition and use an evidence deposition, quote, without prejudice, close quote, to calling that witness, to any party, calling that witness alive at trial. Now, here you have an unusual procedural posture in that the plaintiff's attorney took the evidence deposition, you know, a couple of weeks before the initial trial was scheduled. There was a substitution of counsel. Trial got postponed to January. And then new counsel said, I want to call this person live. This, our expert, live. But is it not under 219 the discretion of the judge to make a ruling there, which he really didn't make. He just suggested what he would do in light of which is common. Somebody goes out and says they're going to do X and then they say they want to do Y. And you expended money to do X. Then you're subject to a judge saying what's fair. Well, 219, Your Honor, in our view, applies in situations where there's a court order or at least an agreement of counsel. There was no agreement here that this evidence deposition was being taken in lieu of coming to trial. But your client could have gone in and had a hearing on that after the defendant filed his petition. We did have a hearing. He didn't file anything. We did file a motion, Your Honor, and we did have a hearing after they had filed their petition. And at that hearing, and this is in, you know, page 11 of our reply brief, but I can give you the record site. But at that hearing, the court said in this case, with both of those motions pending before it, at a hearing to decide those two motions, our motion for leave to call him live at trial and their motion for fees and costs if we did, the court said in this case, if you elect to proceed, the defendants will get reimbursed for what they spent. Defendant's counsel said, Mr. Krause said, just so I'm clear, your order is you're allowing live testimony if that's his decision. You're also granting the petition, the amount of which will be determined. It goes on and the court says, how about this? Before he hits the stand, you pay them first, okay? So put it in the order, Monday the 23rd, okay? That's the date if we were going to call him live that he had to testify. And defendants piped up and said the number for the record is 24,981.27. And the court continued, and it's the court's ruling that since Dr. Vance is requiring payment in advance, the court is asking that the reimbursement cost be paid before Dr. Vance hits the stand. But there's no written order. There was no written order, Your Honor. As with, there was no written order for many of the motions to eliminate. We put those together months, frankly, after the trial. And if you look at the record, we point to this in our initial brief. Defendants' counsel initially agreed on an order which confirmed this. And then when we got to the motion for new trial and asked the court to enter it, the court, six months after the fact, said, wait a minute, I never ruled on this. And viewed that as, in our view, as a way of avoiding having to directly address the language. Whether he flies in and testifies or you press play on the video machine, he's still going to say the same thing that he said before, which is he had no reason to believe that Stevens had not properly disclosed the material risks. Well, and so that may have affected if. And I think that's why you wind up getting a directed verdict. Well, with respect to one of the counts. But Dr. Vance testified in support of both counts. I understand. And one went to the jury. And so the question is, is what is prejudice within, you know, within this Supreme Court rule? And there's no cases that we can tell on that have dealt with this precise issue. It is unusual procedurally. That's perhaps why. But if you look at, on a de novo review, what does without prejudice mean? And I think it's pretty clear that saying you can't bring your expert without first paying their fees and costs for flying out for the evidence deposition, then that's prejudice. And it's directly contrary to the rule. But what if the plaintiff had decided to, you know, secure the testimony by way of evidence deposition so the plaintiff didn't have to worry about scheduling and availability and stuff like that? This is all a, you know, a product of your predecessor's decision making in this case, which you, again, inherited. Which we did inherit, Your Honor. But there's nothing in the record other than the plaintiff initiated the evidence deposition about why they did it. There's certainly no agreement that if they had done it, they had agreed that they wouldn't be calling him live at trial. I think there's an expectation. But the trial judge said even if he comes in live, he can't add to or say anything different than he said in the evidence deposition. So he wasn't going to be able to add anything. He wasn't going to be able to answer questions about a different, take a different tack than using the evidence deposition was essentially the same as having him there in person. Your Honor, I think from my experience at trial, nothing ever comes out exactly the same. I mean, I understand that he would not have been permitted to testify about new topics. But, you know, the questions I would have answered may have been worded differently. His answers undoubtedly would have been worded slightly differently. They would have been on the same topics. But they would have been there live at trial. And I don't think it takes, you know, I don't think we need, you know, a psychologist or someone to come in here and explain that jurors often respond better to live witnesses than they do to play being pushed on a screen, even though screens are getting bigger. And their witnesses testified live before the jury. In fact, in during closing argument, Mr. Martin, one of the defendant's lawyers, said after this was an issue, said Dr. Vance isn't even from here. He didn't even come here. Right? He's an out-of-towner, wouldn't even show up. So they directly use this in closing argument because they believe that prejudice or countered our argument. So, you know, this is a relatively straightforward rules issue. What does without prejudice mean? And I certainly don't think there's anything in that rule that enables the court to basically award sanctions if someone wants to call the witness live at trial after having done that. You know, there's two other issues. One has to do with this neurosyphilis issue. This is not a matter of, you know, she received a false positive, according to the record, for a condition called neurosyphilis, which is a form of syphilis, but that can have very serious neurological conditions and can cause death. And so defendants glommed on that false positive, and for which she initially received some treatment, but then she also had a more definitive subsequent test that ruled out neurosyphilis. Right. That's why I'm here. Yes. So there's no scientific, you know, evidence to a reasonable degree of medical certainty that she was ever diagnosed with this condition. And the defendants were permitted to introduce evidence about the seriousness of that condition. Could that condition cause some of these same symptoms? Could this even lead, result in death? And the problem is, is that... How is that articulated? What terminology was used medically to describe the possible diagnosis? Well, so the neurosyphilis was never mentioned. I mean, because there was two issues, really, with respect to this point. One was saying the word syphilis could be very prejudicial. And the trial court went to some length to say that it could understand how the use of the term syphilis could have some, you know, negative connotation to it, right? That's correct. And, but that was only fixed half the problem, because they shouldn't even be talking about even a neurological condition, which is the phrase we used instead, that the court suggested we use instead. And we agreed once it was clear the court was allowing this to come in. But Dr. Campbell's evidence deposition is the person, the way it came in. And this was a question by defendants at the evidence deposition that says, let's talk about another cause of her joint pain, or perhaps another competent cause of her joint pain that you diagnosed. And that is a neurological condition. That was what was substituted in. Do you know what that is, right? And he says, yes, to the second part of the question. Do you know what neurosyphilis is? And what is that? And then he goes on to say what it is. He says, well, I'm not sure that we've documented a neurological condition, but she had positive serologic markers for having been infected with that organism. And as a result, she was given a very specific treatment to arrest or prevent any progressive problems. But we don't, we didn't have any specific diagnosis of a neurological condition. So that is how it came in. And they were able to argue that there's all these other conditions, including this neurologic condition that could be causing her pain. Well, we know to a reasonable degree of medical certainty that neurosyphilis couldn't have been causing that. Because in the medical records, which were not presented to the jury, and in testimony that was not presented to the jury, they said that was ruled out. They started treatments based on the false positive. They later ruled it out. And we presented that second argument to the court over and over again, at least on two different occasions before trial as part of a motion to eliminate. And the court simply said, based on defendant's representations that she had been diagnosed with neurosyphilis, I'm going to allow it to come in with a change of verbiage. We think that's prejudicial. I mean, it's not even really a four or three issue. It's a due process issue. Nobody should be faced with evidence of something that they never had, that there's no evidence to support. And we believe that that was error. And although the standard review is abuse of discretion on that, but we believe it's clearly an abuse of discretion to allow evidence of something like this to come in. I may ask you to move on, because we're going way beyond your time limit. Your Honor, I'm happy to say, if I could, I would say just a little bit of time. No, you've got two other issues. I've got one other issue, Your Honor, and it's a brief one. But it's the last issue has to do with the cross-examination exhibits. We've found on the Internet technique guides, which are kind of like the owner's manual for the secondary hardware that Dr. Stevens used on the, when the initial failed surgery happened. And this hardware ultimately failed as well. It didn't ultimately heal, which is why she needed a third set of hardware. And these, in order to- You might overcome two issues there. Post-surgery and the discovery DEP wasn't used. I'm not sure that the- As to the issue you're raising. Yeah, the discovery DEP, you know, he had testified at trial. And cross-examination is obviously an opportunity to test his theories, Dr. Stevens' theories, because he was not only the defendant, but he was an expert on his own behalf. And he had said that the technique guides, he had said that the preponderance of evidence of the medical literature supported his, what is called an oblique installation of this hardware. He indicated that. And he also said that technique guides were useful indications of how hardware should be used, but it was up to the surgeon to make decisions. And he had also said that there's nothing, no medical literature that supports a parallel. Our expert had said it should have been installed parallel, which is what the technique guides. And he said there's nothing that supports that. Well, we found the technique guides for this particular hardware, and it said that it was to be installed parallel and was not to be used for this type of distal osteotomy. But those guides were printed after the surgery. They were printed after. And there is this post-occurrence literature point in these things, but that really is like a subsequent remedial measure. That's when the standards change. There's no indication that these, that the standards had changed for this. And that's certainly something that we could have worked out with Dr. Stephens. He could have responded to that and said, well, yeah, back in the day it used to permit it. Now it's changed and doesn't. If he had said there had been a change in it, or that this was somehow different and new, then there would have been no reason to, it would have fallen within that. It should have been used. But given that there had been no change, it was appropriate. This is cross-examination. They hadn't asked for it in their Rule 214 disclosures. They had asked in their Rule 237 disclosures right before trial. It came closer. But Rule 237, the commentary says you can't use 237 to get documents that you never asked for during discovery. It's very, very clear on that point. And so for those reasons, it was cross-examination. He should have been permitted. We should have been permitted to ask him about it. He was able to say, I don't remember whether I used the technique guides. And we weren't able to, because we had nothing to, we weren't able to use those, we had nothing to say on that point. When previously he said he thought he'd reviewed them and that they supported his oblique installation. He said he reviewed the literature, the medical literature, on the Purdue plate, but not the Kondler one. That's right. And the Kondler was his backup plan. His theory was... It actually wasn't a plan. It just sort of was an emergency at that point, because she was already closed up. They had to reopen her and come up with a new plan. It wasn't the backup plan. It was a new plan, because the first plan wasn't going to work, because there was a fracture in her medial hinge. So, you're trying to get in printed documentation about something that was written after all the surgery happened. I'm just not seeing how that works. Well, I'm not sure it would have been, you know, admitted. But we certainly should have been able to talk to him about it for purposes of, you know, testing his credibility. That's what the case law says, is that a lot is permissible for cross-examination. Well, the jury heard him say he read the literature on the first type of hinge, but he did not on the second. The jury already heard that. They did, but what they didn't... Even if you were talking about the literature that was available on the day of surgery, he admitted he didn't read the second one. Yes. The jury heard that. But he also said that he'd read it before. He just hadn't read it in preparation for this. And then on your point about what else was said, is that Dr. Sherwin Ho, their expert, as well as Dr. Stevens, said you always plan for something to go wrong. He claims he called and made sure there was backup hardware there. Right. He didn't read the literature. Had he read the literature, we believe it would have showed that this was improper installation. There's also testimony, though, that the fracture of the medial... Hinge or cortex. ...was relatively common in this kind of surgery. That's right, which is why that should have been disclosed. Dr. Ho, their own expert, said that's the type of thing he would disclose. And, of course, there was no indication that that was ever disclosed to plaintiff. He didn't testify. I think we can all agree that the thing that your client actually signed, probably the day of the surgery that Dr. Stevens presented to her, was hardly robust. But that doesn't mean that his discussion with her wasn't robust. That's correct. And that's why it becomes a credibility test. She didn't remember. No, well, I think if you read her testimony, she says, he told me three things. And then when they asked her on cross-examine, are there other things? Do you remember him saying this? And she's like, I don't remember beyond these three things. But she didn't say he... She didn't remember what she was told. She says, I remember him telling me three things. And that's consistent with not being told about the loss of the medial hinge or the medial cortex. And he didn't claim that he told her that. He said it's usually his habit to go through the risks. But he also says he doesn't believe he would have told a patient about the loss of the medial hinge. That's too technical. I believe, you know, is in essence what we believe he said. But we should have, in our view, been permitted to use these with him on cross-examination. They would have had redirect. The jury should see the back and forth. And we believe it was prejudicial and an abusive description not to. Are you done? I'm done on those points, Your Honor. Thank you. Good morning, Your Honors. As I said before, Katherine Weiler on behalf of the defendants. Before I start, I feel like I should apologize to Justice Lavin for not citing to a case with either his name or his name on the decision somewhere. Well, he cited the Leonardi case, which I lost at trial, lost on appeal, and lost in the Supreme Court. So you got that going for you. I do my best to avoid that. I would also note that Justice Petito, you are on the Zinniotis decision, so I've done my best for two-thirds of the panel. I apologize to Justice Lavin. This case, as the Court knows, is about two questions. One is whether the district, excuse me, the Circuit Court properly granted the motion for directed verdict on the plaintiff's informed consent claim. And second, whether the plaintiff is entitled to a new trial because of alleged trial error. The Circuit Court's ruling should be affirmed in their entirety. As for informed consent, the fundamental problem here is that the plaintiff failed to produce evidence establishing a prima facie case. And that relates to multiple elements, required elements of a prima facie case of informed consent. Certainly the panel has discussed a number of these issues, but I'd like to run through them fairly quickly because I think it is crucial to understanding exactly why Judge Lyons ruled the way he did, granting the directed verdict in this case. The prima facie requirements for an informed consent claim are the physician has a duty to disclose risks, failed to disclose or failed to adequately disclose those risks. The plaintiff needs to establish that as a direct and proximate result of the failure to disclose, the patient consented to a treatment she otherwise would not have consented to. And fourth, the plaintiff needs to establish that she was injured by the proposed treatment. A number of cases of this Court's precedent have been discussed today, and they are important because they are consistent. Those decisions over time have explained this Court's understanding of those prima facie requirements and this Court's understanding based on the interplay between objective evidence, expert evidence, and subjective evidence. So your colleague here leans pretty heavily on the Coriell case. Why don't you tell us why you think he is misinterpreting that case? Coriell discussed the importance, and this is why it's important to walk through those four elements. Coriell discussed the importance of expert testimony related to the first two elements of a prima facie case of informed consent, a physician's duty to disclose material risks, and the failure to disclose those material risks. What Coriell said is that it is necessary to have expert testimony explaining what are those required disclosures. In this case, we have evidence and we have testimony of record. Dr. Vance discussed required disclosures, and Dr. Stevens also discussed the disclosures that he made in this case. Now, in Coriell, the discussion is about material risks, and material is a crucial term. This Court has used it repeatedly in cases discussing informed consent. What is materiality? A physician should have informed the patient, and this is a quote from Coriell, quote, prior to administering medical treatment of the diagnosis, the general nature of the contemplated procedure, the risks involved, the prospects of success, the prognosis if the procedure is not performed, and alternative medical treatment. An expert needs to establish what those requirements are. But materiality is not, you need to walk through each and every single possible specific thing that could happen during the procedure that's a risk. It's material risks. Again, quote, the general nature of the contemplated procedure. Indeed, Cobbs v. Grant, the California case that my opposing counsel mentioned to the Court earlier, makes this even clearer, and Cobbs is a case cited with approval by Coriell. The physician need not deliver a polysyllabic discourse on all possible complications. A mini course in medical science is not required. This discussion about medial hinge and whether there needed to be a specific use of the phrase fracture of the medial hinge relates directly to what Cobbs v. Grant and what Coriell said is not required as a disclosure. There needs to be a disclosure of the general nature of the contemplated procedure, and the evidence here establishes that that's exactly what Dr. Stephens did. Dr. Stephens explained relevant treatment options, pros and cons of the surgery, putting in a bone graft and plate to stabilize, and how the bone will hopefully heal over the postoperative treatment. But Dr. Stephens made clear he explains to a patient what the procedure involves in terms that a layperson could understand. I'm not a physician. If someone tried to explain to me that, well, there's a possibility that the medial hinge could fracture, I probably won't know what that means unless I have it explained to me by an expert in detail. I do, however, understand when a physician says to me, as did Dr. Stephens in this case, the procedure we're discussing involves me fracturing your bone, putting in plates and screws to put it back together, inserting a bone graft and hoping that there is a reunion of the bones. That's what was explained here. There's no dispute about that. And it's important to note the plaintiff's testimony. We just discussed it earlier, Justice Lavin. You pointed to it. The plaintiff, and Justice Pichinsky, you did as well, the plaintiff does not deny that she was told that information. It's absolutely correct that she says she recalls three things, but then she says emphatically when she's asked, Dr. Stephens may have discussed other things with you, but to be fair, you just don't know, right? Quote, well, I've told you what I remember. She's asked again. Quote, there may have been other things that Dr. Stephens talked to you about that you do not recall. Am I correct? Answer, I would assume so. This isn't even a situation where the plaintiff suggested it's absolutely incorrect and there's no way Dr. Stephens told me about the fact that he would be fracturing my bone. She says, I assume he told me those things. I just don't recall. This is page record 728 to 729. It's in the record. That relates to the disclosure of material risks, a required element. That relates to whether or not, in the second required element, there is a failure to disclose risks. Here, there is no failure to disclose those risks. We have Dr. Stephens' testimony that he made the disclosure. We have the plaintiff's testimony that she would assume he made other disclosures, but she doesn't recall. And, Justice Lavin, as you pointed out earlier, we have no opinion from Dr. Vance suggesting that the disclosure was inadequate. And, again, this is where we come back to Coryell. Coryell says there needs to be a, you need to conform to the professional standard of disclosure in order to satisfy that requirement. But to establish what the professional standard of disclosure is, you need an expert to testify. What is that standard? There's no testimony about that here. So, for starters, we have four required elements of a prima facie case of informed consent, and already there's no evidence supporting the second requirement, that there was an inadequate disclosure. And Judge Lyons found specifically that. He said there's no adequate, there's no evidence in the record that supports that the disclosure here was inadequate. On that basis alone, directed verdict was proper. But Judge Lyons went beyond that. The plaintiff was allowed to testify, and the plaintiff had the opportunity to submit evidence related to proximate cause. There is none. There is no evidence of proximate cause in this case. There's been extensive discussion about the distinction that's referenced in all of these cases, in Coryell, in Zaniotis, in all informed consent cases that we've been able to review in Illinois law, about the requirements related to proximate cause. And the plaintiff is certainly correct. Plaintiff's counsel is correct when he states that it is to be, evidence of proximate cause is to be evaluated under an objective standard as opposed to a subjective standard, for the exact reasons, Justice Lavin, that you mentioned. Because presumably the plaintiff will testify that she never would have undergone a procedure. But we don't even have that evidence in this case. There's nothing for the court to evaluate. There's no subjective testimony from the plaintiff saying that she wouldn't have undergone the procedure had she been told of different potential complications. We have no objective testimony anywhere that somehow, some way there would have been a different decision made had the disclosure or, excuse me, had the information given for informed consent been different. And without any of that evidence, there's nothing for the jury to evaluate under an objective standard. Without any evidence at all, the plaintiff can't satisfy that requirement. And again, Judge Lyons points to that specifically in his ruling granting directed verdict. He explains there was no evidence that a reasonably prudent person could review in order to determine whether there's causation in this case. So with that in mind, Judge Lyons found on those two bases, no evidence of any failure of a breach of the duty, no evidence of causation, that the defendants were entitled to a directed verdict. And that ruling should stand. There's nothing different argued on appeal that would change that result. Moving to the second issue, which concerns whether or not trial error necessitates a new trial in this case. The answer to that is no. As a preliminary matter, plaintiff's counsel was talking about the court's decision related to not allowing Dr. Vance to testify live at trial. And even plaintiff's counsel today concedes there wouldn't have been anything different about Dr. Vance's testimony had he been allowed to testify at trial. That of itself establishes exactly why the trial court's decision should be affirmed. There's no error here. There's no abuse of discretion. There is no information. There's no argument about prejudice here. If Dr. Vance's testimony would have been exactly as it was, it's not an abuse of discretion to do, Justice Smith, what you described as the fair thing. And that's exactly what Judge Lyons was trying to do here. What's fair to the parties? The parties were required to travel to California and take an evidence deposition that now isn't even going to be used. Judge Lyons instructed the parties that he would consider ordering reimbursement of some of their costs and fees if the plaintiff elected to move forward with presenting Dr. Vance live at trial. The circuit court also emphatically stated on the record, if that's what you wish to do, plaintiff, you may. There will be no prohibition of you calling Dr. Vance live at trial. But there may be some related rulings about fairness, about you paying for the costs and fees that the defendants now wasted, ongoing and taking this evidence deposition. And the circuit court was never required to make that ruling. I realize that Plaintiff's Counsel suggests today that essentially Judge Lyons did. But Judge Lyons absolutely emphatically in his ruling on post-trial motions reiterated, and this is important, it's Record 1131, quote, to suggest you were backed into a corner and had no choice I think is disingenuous. I think that's an important distinction to say that the court didn't permit you to do it, that's to call Dr. Vance live, without making payment back. No one ever asked me how much I was going to approve in reimbursements. There was never a ruling on that point. There's nothing to be appealed here. As for the two remaining issues raised, they simply do not rise to the level of requiring a new trial. All of Judge Lyons' rulings were correct, and we'll stand on our briefs on those matters. There are no further questions from the panel. Thank you. If I may just come back to some points that Ms. Weiler raised. The issue, obviously from our perspective on the directed verdict, is whether there was evidence on both points one and two, what the duty was and whether she was disclosed, those things were disclosed. What she said, and we go through this in our reply brief, summarize it in our reply brief, is that she was told the three things, but she also, bleeding, infection, and pain discomfort, those were disclosed. She also separately testified, and this is up to page 41, lines 6 through 11, that Dr. Stevens never told her there was a risk the medial hinge could be lost. Now, so we do need an expert testimony to say that that was something that should have been disclosed. Well, Dr. Ho, their own expert, testified that the loss of the medial hinge and the risk of a nonunion were both significant risks that should have been disclosed to plaintiff. Now, Dr. Stevens, the defendant, didn't disagree with that. He said with respect to the loss of the medial hinge, he admitted, quote, the loss of the medial hinge was significant. And he also testified that he did not tell plaintiff, quote, the medial hinge could be fractured, close quote. That's on appendix 268 through 271. So with respect to the nonunion, he claimed that it was his custom and practice to always tell the patient, which suggested that he believes he did it here. But again, he didn't state specifically that he recalled her being told that, and none of the documentation covers either of these points, and there's no evidence that documentation was given to the plaintiff in any event. So I think you really, this really comes down to, there is evidence that should have gone to the jury, that these were significant risks that were not disclosed, and a reasonable juror could have found that to be the case, which is why it should have gone there. So I think it really comes down to the legal question of does Coryell and the other cases require expert testimony with respect to each element, including whether what they were in fact told, and whether, because Dr. Vance did say that she should have been told the risk of a nonunion, the risk of poor healing, and the risk of failure of the loss of the medial hinge. He just said, I wasn't there. I don't know whether he specifically said that or not, presumably because he hadn't seen it in any records. With respect to the last point on Dr. Vance, Ms. Weiler talked about some of the Court's comments about how initially when we were talking about scheduling this expert's live testimony, and before we had filed a motion for leave to do it, and before defendants had filed a motion for a petition for fees and costs, if we did, it was at the last hearing, after both motions had been filed, when I, that's the section of the record that I read earlier, which is on Appendix 183 through 189, and that is when the Court said, you know, the Court is asking that reimbursement costs be paid before Dr. Vance hits the stand. A specific amount was discussed. He said put it in the order. We did put it in the order. Defendants initially agreed with that, and then at the argument on the motion for new trial six months later, when the trial judge indicated that he never ruled on this issue, that is when the defendants went back on their agreement to have that order entered. So we would have an order that would be more clear on this point, but we do believe the transcript is clear. When it comes down to it, these are four issues that we believe, at least the first two, are significant enough on their own to have deprived plaintiff of a fair trial, and we believe that collectively they certainly should, were mistakes and errors that shouldn't have been made, and really hamstrung her ability to present her case to the jury, and we would ask this Court to reverse the trial court's decision, remand it for a new trial. Thank you. You both made very interesting and enjoyable arguments. I would just indicate to counsel, though, I would never take a case that somebody else started. I had defended a guy that did that, and it's tough. It's tough because you're taking what he did, and you probably would not have done what he did, period. So I have to say to you, you did an honorable job doing what you could with what he did. But thank you both.